```
1                   UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2

3

4   JENNIFER CARRION,                )
          Intervenor Plaintiff.      )
5                                    )
    - - - - - - - - - - - - - - - -  )
6                                    )
                                     )
7   SABA HASHEM,                     )
                        Plaintiff,   )
8                                    )
                                     )
9   vs.                              ) CA No. 16-12383-IT
                                     )
10                                   )
    STEPHEN L. D'ANGELO,             )
11                      Defendant.   )

12

13  BEFORE:  THE HONORABLE INDIRA TALWANI

14

15                      SHOW CAUSE HEARING

16

17

                John Joseph Moakley United States Courthouse
18                         Courtroom No. 9
                          One Courthouse Way
19                         Boston, MA 02210
                       Thursday, November 1, 2018
20                          11:37 a.m.

21

22

                      Cheryl Dahlstrom, RMR, CRR
23                       Official Court Reporter
               John Joseph Moakley United States Courthouse
24                 One Courthouse Way, Room 3510
                          Boston, MA 02210
25            Mechanical Steno - Transcript by Computer
```

1    APPEARANCES:

2    ON BEHALF OF THE INTERVENOR PLAINTIFF:

3         RIVERA BUJOSA LAW, PC
          By:  Mernaysa Rivera-Bujosa, Esq.
4         Unit C2 - Shipway Place
          Charlestown, Massachusetts 02129
5

6    ON BEHALF OF THE PLAINTIFF:

7         Albert L. Farrah, Esq.
          One Washington Mall
8         Fifth Floor
          Boston, Massachusetts 02108
9

10   ON BEHALF OF THE DEFENDANT:

11        BRAUCHER & AMANN, PLLC
          By:  William J. Amann, Esq.
12        65 Market Street
          Manchester, New Hampshire 03101
13

14

15

16

17

18

19

20

21

22

23

24

25

1                P R O C E E D I N G S

2          THE CLERK:  U.S. District Court is now in session.

3   The Honorable Judge Indira Talwani presiding.  This is Case No.

4   16-cv-12383, Hashem v. D'Angelo.  Will counsel please identify

5   themselves for the record.

6          MR. FARRAH:  Good morning, your Honor.  Albert Farrah

7   for the plaintiff.

8          THE COURT:  Good morning.

9          MR. AMANN:  Good morning, your Honor.  William Amann

11:37 10   on behalf of Mr. D'Angelo.

11          THE COURT:  Good morning.

12          MR. AMANN:  Who's seated next to me this morning.

13          THE COURT:  Good morning, Mr. D'Angelo.

14          Why is it that my involvement is needed for getting

15   orders complied with?

16          MR. AMANN:  It shouldn't be.  That -- to me, I think

17   that's clear.  I think -- so it's regrettable that we're here.

18   I get that.  There was an order, this Court's order, dated

19   October 1st for Mr. D'Angelo to pay roughly $3,900.  He paid it

11:38 20   23 days later.  I don't know what the Court finds is

21   reasonable, whether it should have been paid within ten days

22   or --

23          THE COURT:  Well, it was an order because of a past

24   failure to pay.  Now, I can go and I can say, Well, I suppose I

25   have to make the assumption that people aren't going to look

1   for any little angle to figure out how to move on and not have

2   to deal with things, and so I should have put a date certain,

3   my bad, for not putting a date certain.

4        MR. AMANN:  I'm not taking that position, your Honor.

5   I'm not certainly trying to, by implication or at all, suggest

6   that the Court has any blame at all.  I'm not -- at all.  I

7   simply think that it was paid within 23 days of the Court order

8   coming out.  I think that's reasonable.  And you're right.

9   Quite honestly, I see this more as a failure between my brother

11:39 10   and I because we shouldn't be here, meaning --

11        THE COURT:  Why would 23 days be reasonable?  When you

12   send a bill out and it hasn't been paid and you finally get

13   someone saying, Could you please pay the bill?  Do you think

14   you then get yet another 23 days on it?

15        MR. AMANN:  I don't, your Honor.  I'm a small

16   businessman, myself, a partner in a firm.  I understand that --

17   again, this is very subjective.  I understand.  I would love it

18   if a bill were paid immediately.  It doesn't always happen that

19   way.  It usually doesn't.  That's just my experience.  If

11:39 20   someone were paying their bills in under 30 days, I consider

21   that reasonable, and I would be happy with that absent other

22   circumstances.  But, again, that's just my personal --

23        THE COURT:  So my suggestion, counsel, in a situation

24   like this, if you received my order and you thought, Huh, I

25   wonder what things I should take, you're welcome to file a

1    motion for clarification.  Do you intend me to pay it today or

2    do I have 30 days?  You could have filed that.  But to just

3    take it on yourself at this point to decide how and when you're

4    going to comply with my orders.  I agree.  It could have been

5    clearer.  It could have said pay this by tomorrow.  I

6    understand that.

7         MR. AMANN:  I didn't take it upon myself, your Honor,

8    to -- I didn't suggest a time frame to my client.  I didn't

9    say, You've got 30 days to pay, nothing like that.  So I'm just

11:40 10   saying the facts are that the order came out on the 1st.  It

11   was paid on the 24th.  I think that's reasonable.

12         THE COURT:  After a motion was filed.

13         MR. AMANN:  Yeah, after a motion --

14         THE COURT:  I take it there was a 7.1 conference

15   before that motion -- before the motion was filed, correct?

16         MR. AMANN:  Attorney Farrah sent some emails, I think,

17   trying to contact either myself or an attorney in my office,

18   but I didn't speak with Attorney Farrah about this though.

19         THE COURT:  Were you aware that he was looking for his

11:41 20   money?

21         MR. AMANN:  Yes, yes, I was, your Honor.

22         THE COURT:  Okay.  Mr. D'Angelo, do you have any

23   further explanation for why you think that it's worth

24   everyone's time here to keep coming back to have orders

25   followed?

1          MR. D'ANGELO:  Your Honor, I'm not going to say

2     anything right now.  I would prefer to not say anything at this

3     point, your Honor.  It won't do anybody any good here.

4          THE COURT:  Okay.  So the other part of my order to

5     show cause was whether there was any reason why I should not be

6     sending all of this to the Board of Bar Overseers.

7          MR. AMANN:  Your Honor, I'm going to regurgitate what

8     I said before.  I think paying it within 23 days is reasonable,

9     in hindsight, looking at this.  We don't want to be here.  I

11:41 10  understand Mr. Farrah's position, that there was a prior -- he

11    had to file a motion before and follow that through.  He

12    shouldn't have to do that.  I understand that.

13         Mr. D'Angelo paid that.  It was a lot of money.  It

14    was, like, $6,600 or something.  That's done.  So I'm not -- I

15    understand Attorney Farrah is maybe following very closely on

16    this, not giving Mr. D'Angelo much leeway.  I get that.  I just

17    think there's nothing further outstanding.  These are

18    essentially, as I see it, some discovery disputes on what needs

19    to be followed up on.

11:42 20        Frankly, I don't think we're going to see any other

21    motions like this.  I defer to my brother on that, but there's

22    nothing else out there that needs to be paid or produced to

23    Attorney Farrah.  Paid within 23 days.  So I think a referral

24    to the Bar, I don't think, is warranted.  Again, I'm biased

25    because I represent Mr. D'Angelo, but I don't think it is.  If

1    it were -- I don't know what the magic number is, your Honor.

2    I think if it were --

3          THE COURT:  Here's my problem.  I have a case.  It is

4    a case that -- as I see the overlay on this case -- and maybe

5    I'm incorrect.  But there's a dispute between the two parties

6    here in front of me.  I don't know who's right or who's wrong.

7    That hasn't been decided here.

8          But, in addition, there's prior judgments that have --

9    a prior judgment that has gone up on appeal and back down that

11:43 10    is just sitting there not being paid either.  So there seems to

11    be this sense -- and then there's sort of slow grind on

12    discovery as if none of this matters.  If I was dealing with

13    people who weren't lawyers, that would be one thing.  But to be

14    dealing with a lawyer who can't be in this position without

15    understanding that part of -- how our entire system of justice

16    works is that people respond to pieces of paper, that we don't

17    have to hit people over the head to get results.

18          And so the idea that we are here on a 2016 case, which

19    probably has as a huge driver the underlying judgment from the

11:44 20    intervenor here and that unpaid balance, I just find myself --

21    I've never seen anything like it.  I don't understand how, as a

22    practicing attorney, there can be just this sort of, I don't

23    like what judges say to me, so I'm just not going to follow

24    them, kind of attitude.  That's what this feels like.

25          MR. AMANN:  Well, Judge, I'm sure you are aware of

1    this.  The judgment that's outstanding is not against Mr.

2    D'Angelo personally.  It was against the law firm.

3              THE COURT:  That was a partnership, right?

4              MR. AMANN:  True, yes.

5              THE COURT:  So does he have any responsibility?  Are

6    you really standing up in front of me litigating this, all of

7    you, with the idea that you can get a judgment against you,

8    and, as partners, you get to just walk off, to hell with the

9    person who won that judgment?  That's your position as lawyers?

11:45 10         MR. AMANN:  No, no, no, it's not, your Honor.  What

11   we're -- what we've said before and will become clear as this

12   case goes on is that we've got Mr. Hashem, who has a judgment

13   against him personally.  We've got the law firm, Saba Hashem.

14   So we're tying to paint a picture of what the finances were at

15   the time.

16         I understand that the intervenor is trying -- has

17   brought further counts in trying to essentially stick Mr.

18   D'Angelo with this personally.  We just -- we oppose that.

19         THE COURT:  And if we could oppose it on the merits,

11:45 20   you would get to be heard on the merits, and I would be able to

21   figure it out.  Instead, what I am seeing is I have an

22   intervenor who says, I have a judgment and nothing is

23   happening, and then I have these little discovery disputes and

24   nothing is happening.  It echoes.  That echo doesn't do your

25   client any good.

1          Your client was here saying, I am taking the

2     proceedings in this courtroom seriously.  I think I have a

3     legal right.  I want my legal right to be heard.  I want to

4     have these things addressed.  I would have a lot of respect for

5     that.  I can deal with that.  I can understand that we're going

6     to have an issue here that's going to be decided on the law and

7     the facts and try to figure that out.

8          But if, as I am trying to get to that factual and

9     legal resolution, I am confronted with every single turn -- I

11:46 10    just won't turn in discovery; I just won't turn the documents

11    over -- it's just a little bit old.  I won't respond to a

12    motion.  Oh, I guess I'm going to lose this motion.  I won't

13    bother filing an opposition.  I'll just let it all go.

14          MR. AMANN:  Judge, we're not letting anything go.

15    This court order was clear what was to be paid.  True, it

16    didn't have a date.  I don't know what Mr. D'Angelo thought as

17    far as when that was due and payable.  I don't.  At the risk of

18    saying it again, it was paid three weeks.  I understand

19    Attorney Farrah had to file a motion to compel where he felt

11:47 20    that he needed to do that.

21          THE COURT:  What was -- what's your suggestion for

22    what he should do?  He writes you an email.  There's no

23    response.  What else is he supposed to do but have to go and

24    file another motion?

25          MR. AMANN:  I think, if there's no response, you're

1     right.  I would do the same thing if I got no response.

2            THE COURT:  Okay.  So that's our problem, right?  This

3     isn't a problem that your client isn't being heard.  It's that

4     your client is ignoring me.

5            MR. AMANN:  Judge, he paid this, like I said, within

6     three weeks of the order.

7            THE COURT:  Did I have to set this hearing in order to

8     get him to pay it?  Did I have to spend the time in chambers

9     and issue an order to show cause?

11:48 10       MR. AMANN:  He paid before the show cause order

11    issued, but it was one day after the show -- the motion.

12           THE COURT:  You could have filed -- you could have

13    saved me the time.  You could have immediately filed something

14    and said, We're paying the money.  Please don't.  Please deny

15    the motion.  You could have done that.  There was nothing that

16    said you had to wait 14 days to file something.

17           MR. AMANN:  That's right, your Honor.  I --

18           THE COURT:  Instead, I had to take the time and figure

19    out what am I going to do with this and get you back in here.

11:48 20  Now I'm taking the time, sitting here on the bench.

21           MR. AMANN:  I apologize for that.  I was unaware that

22    the payment was made.  It didn't come from our office.  It was

23    postmarked in an affidavit that was filed this morning, and I

24    don't know -- by Attorney Farrah.  I don't know if you had an

25    opportunity to look at it.  I'm not expecting that you had the

1    opportunity to look at this.

2         THE COURT:  No.

3         MR. AMANN:  But Attorney Farrah's affidavit that was

4    filed today, from the best I can tell by looking at my phone,

5    was a copy of the check that Attorney D'Angelo paid.  It was a

6    certified bank check that was dated October 24th.  There was

7    also an envelope from Mr. D'Angelo's North Andover,

8    Massachusetts, office directly to Mr. Farrah.  I think it's

9    Exhibit D.  I didn't know that.  I didn't know that that had

11:49 10   been paid.  That is clearly a miscommunication or lack of

11   communication between my client and I.

12        But Attorney Farrah knew as of -- I don't know when he

13   received the check.  It was dated the 24th of October so maybe

14   a day or two.  He could have withdrawn the -- his motion to

15   compel and not been here, but I'm not blaming him either.  I --

16   I think we need to focus, as your Honor has suggested, on the

17   merits of this case.  Luckily, discovery is over or winding

18   down, and that's where we want to be because that's what needs

19   to be decided.

11:50 20        And I apologize that we're here today for this, your

21   Honor, but he paid it within almost three weeks, three weeks

22   and a day, and we feel that that's reasonable.

23        MR. FARRAH:  Your Honor, may I?  We filed through the

24   ECF system this morning.

25        THE COURT:  Is there a reason why that was filed this

1    morning?  You know --

2           MR. FARRAH:  No.

3           THE COURT:  I don't understand -- I do not understand

4    a practicing of law that would -- I have things to do also.

5    You're filing something that has been in your hands for how

6    much time?  Were you afraid I was going to cancel the hearing?

7           MR. FARRAH:  Not at all, not in the least, your Honor.

8           THE COURT:  Then why didn't you file this?

9           MR. FARRAH:  It was filed this morning.  We received

11:50 10   -- we received Mr. D'Angelo's check on Friday, the 26th.  So,

11   theoretically, I could have filed it that day, Monday or

12   Tuesday or Wednesday.  I apologize.  It's certainly hasn't

13   garnered me any advantage over anybody in this case.  And the

14   only reason I filed it was to give the Court some more

15   background about the payment that came in 23 days later.

16          And what I have here -- I'm happy to give you a paper

17   copy, and I'm also happy to just tell you what it says.  What I

18   have here is, first, my motion filed on the 23rd.  On the 24th,

19   the next day, a reporter from one of the online legal services

11:51 20   contacted me by email and I'm pretty sure contacted Mr. Amann

21   by email as well, saying, We're going to write a story about

22   this.  Do you care to comment?  I said, No, I don't care to

23   comment.  The next day he wrote a story, and Mr. Amann didn't

24   comment either so -- and then postmarked on the 24th from

25   Manchester, New Hampshire, where Mr. Amann has an office, was a

1    letter to me with a check inside.

2           This is the same scenario, your Honor, that happened

3    the last time; that is, that the day before or two days before,

4    hot on the heels of your setting us down for a hearing in front

5    of you to talk about Mr. D'Angelo's serial ignoring of the

6    orders of this Court for years now, from the beginning, in

7    2016.  I got a check, and at the time I cashed the check.

8           You came very close to sanctioning Mr. D'Angelo the

9    last time and pulled back at the last minute and just ordered

11:52 10   that he pay the time that I spent preparing the motion, and

11   that's what -- out of which came the $3,900 or so fee.  I'm not

12   weighing in on whether his serial violations of his discovery

13   obligations and your orders should be something that goes to

14   the Board of Bar Overseers, but you can't let him off the hook

15   again for those violations.  There is no explanation for this.

16   The claim that we should get down to the merits of this case or

17   the claim that he did pay within 23 days just falls apart when

18   you look at the facts, and the facts are it wasn't -- I sent

19   two emails to his attorney's office saying, What's the story?

11:53 20   Call me about getting paid.  Neither one was responded to.

21          The only reason that he paid on the 23rd -- excuse me.

22   The only reason he mailed a check on the 24th was, I believe, a

23   combination of:  (a), the filing of my motion on the 23rd and

24   the reporter from the Online Law 360, or something like that,

25   contacting both Mr. Amann and me.

1          So to say that he paid within 23 days is just -- it's

2     just -- it's a -- it's not legitimate.  It's not genuine.

3     Again, you know, this has gone on and on and on.  This case is

4     difficult enough, complicated enough.  To have to deal with

5     these violations constantly, it's just not fair.  And you can't

6     let him off the hook again; you can't reward him again, your

7     Honor.  Thank you.

8          MR. AMANN:  Judge.

9          THE COURT:  Hold on a minute.

11:54 10          MS. RIVERA-BUJOSA:  I just want to add that we had

11     three meetings at defendant's counsel's office to obtain and

12     look at files.  I brought staff paralegals each of those times.

13     Neither one of those times -- that was in May; that was in

14     July; that was in March -- were the IOLTA reports provided.

15     Not at one point were the agreements -- contingency fee

16     agreements easily -- or even able to be found.  We had found

17     one with the old firm, not the new one.

18          Discovery has been a drag.  It makes motions to

19     compel, tons of emails, thousands of documents to prepare, all

11:55 20     of which could have been just click by the accountant and we

21     get July 24th after I subpoena the accountant.  It's been one

22     thing after the other.

23          I'm -- don't -- I think it's petty to -- this is not

24     an attorney-attorney dispute.  I want to get summary judgment

25     done.  I've been working very hard.  We have a deadline on

1    November 15th, making sure I have everything.  The only thing

2    that needs to be updated is the tax returns of 2017 because now

3    it's October 15th.  They should have been filed.  They're under

4    my subpoena and under interrogatories and under many facets of

5    discovery made.  This has to stop.

6         I'm finally at a position that I'm two weeks beyond --

7    I'm two weeks into summary judgment, going through thousands of

8    files.  And all of this could have been done in March, in May,

9    in July.  And Attorney Farrah was there with me.  Bill or his

11:56 10  associate Josh was there with me.  And the amount of hours I've

11   spent, it's part of also my summary judgment motion.  That's

12   why I haven't made a separate motion which sometimes I wonder

13   maybe I should because even Attorney Farrah cites my draft of

14   motion to compel that he reviewed, and then he filed his motion

15   a few days later.

16        The time is -- this is unnecessary.  That's what I

17   just -- I need to say that.  I'm beyond -- there has not been

18   one cent paid in this case.  The judgment keeps growing, 12

19   percent a year.  I mean, we're up to over -- we're close to

11:56 20  $590,000, and this judgment had a face value of 252,000.  I

21   don't want to give away my summary judgment, but there many

22   instances there's been so much money flushed through their

23   firm, now in the hands of another firm, D'Angelo Law Group.

24   It's been since 2015 to 2017.  I'm focusing just on that.

25   There's been over a million dollars in fees.  Cases that were

1    filed by D'Angelo and Hashem in 2013, 2014.  We went through

2    huge cases just to find something that could be easily just

3    provided.  I'm alleging and I'm pleading all of that, but I

4    just have to say that.  That's all.

5          I think you should punish him because, if not, he's

6    not going to take this proceeding seriously.  He hasn't.  I

7    mean, at D'Angelo Law Group's depositions, when he should have

8    given me everything about every case that was previously the

9    other firm's, he should have everything accessible, not me take

11:57 10   two months after of emails, motions, to get this stuff.  That's

11   all I need to say.

12          THE COURT:  Okay.

13          MR. AMANN:  The only thing I can add to this, your

14   Honor, is that we weren't here that long ago, and I think your

15   Honor reset, for lack of a better word, some of the timelines.

16   You know, there's the motion for summary judgment, designation

17   of experts.  Those are all in place.

18          There's no motion to compel from the intervenor.  I

19   know that my office has been working diligently.  There's been

11:58 20   a lot of emails that I've been cc'd on and progress being made

21   as far as documents turned over, QuickBooks.  There's a lot of

22   material.  I'm surprised a little bit to hear that because,

23   from my standpoint, that has all been turned over.  Yes, it's

24   taken awhile, but we're talking about years and years, a lot of

25   cases, a lot of documents.  But we're there.

1          I guess to say, as far as the intervenor's role, I do

2     understand the intervenor is owed a judgment, and she's

3     probably really frustrated and I get that.  That's why I was

4     suggesting -- one of the reasons I was suggesting that the

5     sooner we get to the merits of this case, the better it's going

6     to be for everyone, win or lose, because then there's going to

7     be a decision.  And everyone is going to have to deal with it,

8     good or bad.  And so that's where -- and I think we're on

9     target for doing that.  Thanks to your Honor, we've got these

11:59 10   deadlines in place.

11          As far as what my brother Attorney Farrah says --

12          THE COURT:  Can I ask a very simple factual question

13     that I don't have the chronology down?  When that judgment came

14     down, was the law firm already split, or was that law firm

15     still together?

16          MS. RIVERA-BUJOSA:  Still together.

17          MR. AMANN:  Correct.  It had not been ended or split,

18     as you say, at that point.

19          THE COURT:  So how do I not have this impression that

11:59 20   there is a disinterest in complying with court orders?  There

21     was no -- there's no -- I don't know of any defense then,

22     right?  You had an final judgment, all the appeals, et cetera,

23     and yet the money wasn't paid.

24          So how do I not walk away from this with the

25     impression that I have a lawyer who continues practicing,

1   holding a license, and yet has complete disdain for the orders

2   of a Court?

3          MR. AMANN:  Number 1, I don't know what the finances

4   at the time of the -- when the judgment was final was.  You

5   might say, well, who cares what the finances were.  I don't

6   know what the ability -- there's been claims by the intervenor

7   that the law firm -- we'll call it the old firm, Hashem and --

8          THE COURT:  Normally, what people do when they have a

9   judgment, maybe they file for bankruptcy.  But they don't just

12:01 10   have a judgment against them and thumb their nose.  I just -- I

11   don't -- I understand that things got complicated when the law

12   firm fell apart.  But I don't understand the part of this story

13   -- I can't understand.  There's been no explanation given to me

14   other than, well, so what?  And that "so what," I understand

15   that from non-lawyers because people don't live by the word of

16   the court, and they think, okay, maybe courts don't really

17   matter until someone comes and seizes my house or something

18   like that.

19          I don't understand how practicing lawyers, faced with

12:01 20   a judgment, where all appeals have been exhausted, its reaction

21   is, well, that's not my problem.  I just don't understand that.

22          MR. AMANN:  That's not my prerogative at all, your

23   Honor, not at all.  What I think any lawyer would do when

24   they've got a client who's got a judgment, not against him

25   personally but, again, against a defunct law firm --

1        THE COURT:  That's -- my question is:  It was not a

2   defunct law firm at the time the judgment became a final

3   judgment.  So as I am looking and looking at myself and this

4   question, seriously, whether this is something that at this

5   point the Board of Bar Overseers should have notice of what's

6   going on.  Has anything been filed with the Board of Bar

7   Overseers up to this point?

8        MR. AMANN:  Not by us, your Honor, no.

9        MR. FARRAH:  Not to my knowledge.  Your Honor, my

12:02 10   client is suspended from the practice.

11        THE COURT:  I understand that.

12        MS. RIVERA-BUJOSA:  My client's just seeking

13   collection of the monies that she's owed.  If his ability to

14   pay is -- at this point, I can't believe what has gone to up to

15   today, your Honor.  I think the modus operandi as to why, when

16   four years, which is the essence of my summary judgment motion,

17   when they had money, there was not a payment plan or could not

18   be paid, I think it's because my client is a single mother of

19   three and didn't expect somebody to go spend $7,000, which is

12:03 20   how much I've spent out of pocket myself to collect and make

21   justice right.

22        And I think he knows that better than anybody, and I

23   believe that's the modus operandi why this judgment is still

24   not paid because nobody believed that this was a serious matter

25   what my client suffered and earned herself a jury.  That goes

1    to both parties on this case because both parties had an

2    ability to make a difference and start paying my client who was

3    homeless because of this.

4         I shouldn't have to go and spend all this money --

5    it's just preposterous -- to collect a civil rights execution.

6    There was a preliminary injunction order in 2012 telling

7    partners not to dissipate assets.  Well, there were many, many,

8    many, many instances, especially in 2015, September, and then

9    three months later, boom, the law firm is defunct.  But in

12:04 10    2014, there was half a million dollars in that account.  My

11    judgment then was about 300,000.  Now, I wasn't part at that

12    time, your Honor.  We had a previous collection lawyer there.

13    But you're right.

14         I think maybe the BBO needs to be notified, but my

15    client needs to also receive her payments.  And I'm scared

16    that, as more time goes by, as the response deadlines for

17    summary judgment happen, then what other reach and applies do I

18    have to go looking for?  I'm concerned about that because there

19    has been not one offer, not one, by Mr. D'Angelo's side.

12:04 20         MR. AMANN:  Judge, there was an offer in writing

21    before I got involved in this case.  I know that this was

22    discovered.  The letters were --

23         MS. RIVERA-BUJOSA:  It's not --

24         MR. AMANN:  -- part of the discovery.  But to say that

25    Mr. D'Angelo personally didn't take this seriously years ago,

1    there was a written offer by an Attorney --

2         THE COURT:  It's -- when you get a judgment, you don't

3    then get to start saying let me make compromise offers or I'm

4    not going to pay.  When you get a judgment and you have

5    exhausted your appeals, that money is due.  Now, that money may

6    have been due from the law firm and not from this gentleman

7    individually, but it doesn't mean there isn't a court order and

8    a judgment and an amount due.

9         I just -- I find this -- I can't get my head around

12:05 10   this.  It just seems to me that there's been an untethering

11   between the understanding of the practice of law and the

12   gamesmanship here.  I just don't get it.  And it may be that

13   somehow we're going to be able to find as we go forward that

14   everything was proper and no money is due and that this is all

15   separate.  But given that, as I understand the story line here,

16   there are clients from the original firm that get moved over

17   there, it seems a little bit difficult to not be able to sort

18   of say I have no responsibility here.

19        MR. AMANN:  What we've said consistently, your Honor,

12:06 20   is that there's quantum meruit available to Mr. Hashem because

21   he's suspended.  Our view and our understanding of the

22   applicable rules of ethics is that he's not entitled to share

23   as if he were an attorney because --

24        THE COURT:  Forget about the claim against Mr. Hashem,

25   okay.  There's a claim against the partnership, right?  So that

1    claim -- and that as far as -- is that -- I don't know if

2    that's a separate judgment or joint and several.  I don't know.

3          MS. RIVERA-BUJOSA:  It's joint and several.  The

4    limits -- there were limits set by the Court as to certain

5    amounts are one partner's only and the other amounts are the

6    firm's, but the firm's is a bigger amount.

7          THE COURT:  So you have an amount at the firm, and it

8    doesn't -- it may feel unfair for the remaining partner to be

9    stuck with the liabilities of the firm, but that's kind of the

12:07 10    way partnership law works.  And then to say, well, I've created

11    this new entity doesn't get you out of obligations that may

12    have been yours.

13          And so it may not be fair between these two gentlemen.

14    I am net weighing in on that dispute with a ten-foot pole at

15    this point.  I have no facts between your client and your

16    client.  But as to the fact that there is a judgment out

17    against the law firm, the sort of attitude that that isn't

18    something that concerns your client, I find remarkable for a

19    lawyer.

12:07 20          MR. AMANN:  I agree.  I don't think that's his

21    position at all.  The position is --

22          THE COURT:  So I need -- frankly, you know, it may not

23    be that I'm the one who makes the credibility determinations.

24    It may be that it's for a jury.  But I can tell you, as we go

25    along, it is pretty hard to treat someone's good faith as being

1   good faith if I have to be here fighting over these kind of

2   things to get in the tiniest little piece along the way.  That

3   just doesn't make sense.

4        MR. AMANN:  Agreed.  All of these things are going to

5   be -- are issues, need to be heard, should be heard, and I'm

6   not saying as soon as possible.  There's orders and dates, and

7   he'll have his day in court.  My client will have his day in

8   court as will everyone else here.

9        I think the real fight -- I feel bad for Ms. Carrion.

12:08 10   We've never had an issue with that.  To me, this has been -- as

11   far as the question, what, if anything, is due between Mr.

12   D'Angelo and --

13        THE COURT:  Yes.  And here's your problem:  You don't

14   have a right to have that decided first.  There's not --

15   there's no reason -- there's no priority for that decision to

16   be decided first.  I can place the intervenor's claim first.

17   Once hers is resolved, the two of you can fight it out.  But

18   there's nothing to stop her from being able to get the money

19   from -- it's joint and several.  She gets it from the firm and

12:09 20   from the firm from where she gets it from the firm.  I don't

21   have to resolve your relative -- the relative values between

22   these two -- between your two clients till after that gets

23   resolved.

24        MR. FARRAH:  Keep in mind, your Honor, respectfully,

25   that we're here to try to resolve the dispute with Mr. D'Angelo

1    so that we can assist in paying Ms. Carrion.

2         THE COURT:  That sounds great, but I am not going to

3    hold her claim hostage to your client and your client ever

4    being able to work anything else out.  Since that's probably

5    never going to happen, that your clients are going to be

6    working things out, we're going to be dealing with it either on

7    motion practice or in front of a jury.  But we're not getting

8    delay.

9         I'm not going to -- the affront to the -- to my

12:10 10  authority and what seems to be a contempt for the rules of the

11    orders of the Court, I am not at this point reporting to the

12    Board of Bar Overseers, as I don't think that this is something

13    that is interfering with your client's ability to represent his

14    own clients, and I don't see anything improper in his practice

15    as a lawyer.  So I will not be representing -- I will not be

16    sending it over.

17         But I do have to say that, in terms of his

18    understanding of how to follow an order and the importance of

19    following an order, it is hard -- the same thing goes for your

12:11 20  client.  The fact that he is not practicing doesn't mean he

21    doesn't have full -- he is on full notice of what the

22    requirements are for following court orders.

23         MR. FARRAH:  I'm sorry to interrupt.  With all due

24    respect, there's never been an allegation that my client hasn't

25    followed this Court's orders or hasn't complied with discovery,

1    respectfully, your Honor, never, not a hint.  It's all been

2    D'Angelo, and it's been D'Angelo from the beginning.  So I hope

3    you're going to sanction him, respectfully, Judge.

4    THE COURT:  Well, I am going to sanction.  And the

5    question here is -- I don't need to -- I don't need to sanction

6    more than is necessary to get my message through, but I do need

7    to sanction in that amount.  And I don't see here the notion

8    of, well, I can pay money only after the motion is filed.  That

9    doesn't work, right?

12:12 10    MR. AMANN:  Right.  I agree with that, your Honor.  It

11   shouldn't have to come to parties filing motions to follow up

12   on things.  I get that.  I'm not standing here and saying

13   otherwise.

14   I think, to keep this thing on track -- again, this is

15   a suggestion.  You know, the words of -- or the sword of

16   Damocles or whatever that is.  What I would suggest is, if you

17   really want to fashion something, then if there's an order that

18   you suspend over Mr. D'Angelo's head that if there's any other

19   noncompliance, as the Court sees it, then here's the wallop.

12:12 20   Here's -- whatever the number is.

21   MR. FARRAH:  That's no sanction, respectfully.

22   MR. AMANN:  I think it's one of the goals, clearly, of

23   a sanction, is to deter any future conduct.  I know that

24   Attorney Farrah says it's disingenuous, the fact that it was

25   paid within 23 days.  It is what it is.  That's what happened.

1      As far as Mr. Farrah's --

2            THE COURT:  Give me anything -- tell me any piece that

3      can get -- let me walk away from this thinking that it isn't

4      because he's had to come running back crying to me on this

5      stuff that gets any action because I don't want to be in this

6      kind of a role.  I'd like to decide -- I would like to spend my

7      time deciding the things that actually get to resolving a real

8      dispute.  I really do not want to be spending my time having to

9      sit here on this kind of a motion.

12:13 10            MR. AMANN:  Agreed.  And I couldn't agree with you

11      more, your Honor, for everyone.  You know, I used to liken

12      judges having to deal with these things -- my kids are grown

13      now, but nobody likes to have fights of this nature, I think.

14      That's my prerogative anyway because they should be resolved

15      either among counsel or they should not even occur in the first

16      place.

17            That's why I'm suggesting at this point -- I didn't

18      know the check was sent directly to Attorney Farrah.

19            THE COURT:  It doesn't matter when the check was.  The

12:14 20      problem is the check was sent after your client -- after the

21      motion was filed and, as far as I know, after the client

22      received -- had notice that the motion was filed.

23            MR. D'ANGELO:  I didn't have any notice on this, your

24      Honor.  I will be honest with you.  I can't discuss it right

25      now, but I didn't have any notice of this.

1       My counsel and I -- I can't discuss the issue at this

2   point in time.  I'd prefer -- if you want for me to file

3   something down the road here in a week because I'm just at this

4   point in time -- I hear where you're coming from, but I've been

5   caught up in this -- in the rapids of this river without a

6   paddle.  And I heard you last time we were here, and I thought

7   that things were resolved.  But at this point, your Honor, I am

8   -- I haven't had any communication with my counsel, none, since

9   the last hearing that we had here, no phone calls, nothing.

12:15 10   Okay.  I had an email discussion with him the week before about

11   this.  You know, I have the emails with me, but I'm not going

12   to share them today.  I don't think it's appropriate.  And if

13   you give me a week to deal with this issue on my own, I will

14   probably have a better answer for you at that point.

15       MR. FARRAH:  None of us should suffer because of

16   whatever miscommunication or lack of communication is happening

17   between Mr. D'Angelo and his counsel.

18       THE COURT:  Yes.  But there is a difference between

19   whether Mr. D'Angelo is acting with contempt towards the Court

12:16 20   or is acting without awareness of where things are.  Those are

21   two different things.

22       MR. FARRAH:  For sure, for sure.  But the evidence

23   weighs heavily against Mr. D'Angelo and his position.  You

24   know, he's hiding behind the attorney/client privilege.  He's

25   got emails he doesn't want to show you.  But, serendipitously,

1    the day after I file my motion he sends a check;

2    serendipitously, the day that the newspaper reporter reaches

3    out to me and certainly to Mr. Amann -- no question about

4    that -- he sends a check.

5             THE COURT:  Can I just say as a side note, why Law 360

6    thinks any of this is interesting is beyond me.

7             MR. FARRAH:  That makes two of us that feels that way,

8    Judge.  This has been going on from the beginning.

9             THE COURT:  Okay.

12:16 10          MR. FARRAH:  No mercy for Mr. D'Angelo, respectfully,

11   your Honor, on this one.  This up a river without a paddle, he

12   just settled a case, one of the cases that we're interested in,

13   with a $190,000 fee coming his way.  And the suggestion that he

14   is incapable -- that there is some problem between his client

15   and him -- his attorney and him or that he's incapable of

16   paying the Court's order when the Court made the order, October

17   1st or soon thereafter, is, you know, it's -- it borders on a

18   fraud on the Court is what it does.  It really is beyond enough

19   at this point, this seems to me.  This goes back to the

12:17 20   automatic disclosures.

21             THE COURT:  Okay.  We're dealing with one thing at a

22   time.

23             MS. RIVERA-BUJOSA:  Your Honor, last time at court you

24   made it clear that he was going to be sanctioned and had to pay

25   attorneys' fees.  As counsel, you take that very seriously.

1    And you have independent -- as a federal litigator, as he is,

2    to look at PACER and see, has this been filed?  Have I paid?

3    How is that -- how can anybody with candor say, I do not know;

4    I did not pay the attorneys' fees due when you told him

5    directly that you have to?  I'm appalled.  I'm appalled.

6         MR. AMANN:  I think the question is a matter -- is

7    timing.  The question really is:  What's reasonable to pay?

8    When?  Is it immediately?  As Judge Rosenthal used to say,

9    "Forthwith means now."  Does "now" mean 24 hours, 48 hours?

12:18 10       All I'm saying is, from Mr. D'Angelo's position, I

11   don't think he's saying he didn't have to pay.  No.  He paid it

12   within 23 days of this Court issuing an order that he pay that

13   amount, and he paid that amount.  And that was submitted by

14   Attorney Farrah.  I don't know.  The suggestion that there was

15   a motion to compel --

16        THE COURT:  When did Mr. D'Angelo have notice of my

17   order, my written order?

18        MR. AMANN:  Soon after it issued, before -- certainly

19   before the 23rd if that's the question.  I can get an exact

12:19 20   date for you, but, again, I don't think there's a question or

21   an argument that he didn't know that he had to pay it.  And I

22   don't know if Mr. D'Angelo thought I can pay that next week.  I

23   get money.  I don't know.  But he paid it within 23 days of the

24   order issuing; and if the order said you've got to pay it

25   within ten days and he didn't make that ten days or we didn't

1    file a motion to extend to get more time, I could see that.

2    There would be really no excuse.

3            THE COURT:  Is there any dispute that there was no

4    communication between your office and Mr. D'Angelo after you

5    had plaintiff's counsel reaching out to you about compliance

6    with this order?

7            MR. AMANN:  There were multiple emails, your Honor,

8    from -- between attorney and client.  So I think to say there's

9    no communication is not accurate.

12:20 10            THE COURT:  Okay.  I am -- I am sanctioning.  Let me

11    ask this question:  Mr. D'Angelo, do you -- are you on PACER?

12    Do you get copies of the PACER --

13            MR. D'ANGELO:  I get them forwarded by counsel.  Yes,

14    I'm on PACER, but I don't check PACER or do I get copies of

15    whatever orders are being issued or whatever.  I don't get

16    those.

17            THE COURT:  You were here on September 5th, that

18    proceeding.

19            MR. D'ANGELO:  Yes.

12:22 20            THE COURT:  And after that proceeding, the electronic

21    notes relaying what happened state:  "Case called.  Court has

22    colloquy with counsel.  No opposition to the motion was filed.

23    Defendant requests to proceed with an opposition in open court.

24    Court hears argument on motion.  Court awards attorneys' fees

25    to plaintiff in bringing the motion and for the first half of

1    today's proceedings.  Plaintiff shall file a request for these

2    fees by September 13th.  Defendant may file an objection seven

3    days after the request is filed.  Any further issues of this

4    nature shall be met with severe sanctions."

5         So that's what the court reporter -- court clerk

6    docketed of what I had said.  So you were on verbal notice on

7    September 5th of two things.  One is that you were being

8    sanctioned and that you would be required to pay attorneys'

9    fees and that any further issues of this nature would be met

12:23 10   with severe sanctions.

11        Then the amount of the fee request was made, and there

12   was no opposition.  And so, again, on October 1st, I issued the

13   order on the fees, awarding the fees in that amount.  And I can

14   understand that there's some disagreement between you and your

15   counsel about communicating, but you were here in September for

16   that hearing.

17        MR. D'ANGELO:  Yes, I was, your Honor.  And at this

18   stage of the game, counsel told me that day, I'll take care of

19   it.  Don't worry about anything.  I'll take care of the fees

12:24 20   and everything else.  And then October 17th rolls in, and I get

21   a note that says I have to pay.  I go back and I said, Well,

22   no, you told me that you were going to take care of this.  Then

23   I get note back from counsel saying, Well, I'll spread this out

24   over three months.  You pay it.

25        I made phone calls to him, not returned.  When I

1   didn't hear from him by Tuesday, I went and gathered the funds

2   together and paid this on Wednesday.  I've got email here to

3   verify all of this nonsense that took place on the 17th.

4   That's what I didn't want to do today because, in essence, you

5   know, I'm done with this counsel, and I'm trying to negotiate

6   with a couple.  I've talked to three different firms and

7   meeting this afternoon to find another attorney to represent me

8   because there's an irretrievable breakdown here that's been

9   going on for months.

12:25 10        I, as you were aware, went into the hospital, had open

11   heart surgery, was in -- out the entire month of April and May.

12   I barely was able to get back into my office in June.  All this

13   discovery, what they're looking for and propounded, I came back

14   a couple days during the week to get that stuff done during my

15   recuperation period to try to get as much as I could.  But it

16   looks like I'm holding the show up.

17        Hashem files bankruptcy, I believe, in January that

18   held up the case for doing anything for about 60 days or 90

19   days.  I can't remember exactly.  Everything went into

12:26 20   suspended animation at that point in time.  So it's not all my

21   fault that discovery didn't get done in a timely manner.  It's

22   the circumstances of all these events that took place.

23        Would I have done something differently here if I had

24   been more able to participate?  Yeah, definitely.  That's why

25   I'm seeking new counsel in this matter.

1          You know, if I have to turn this over today so the

2   Court recognizes as to what took place, I will do that.  But it

3   is attorney-client privileged material between him and I; but

4   since I have to defend myself in these circumstances, I'm

5   willing to give that up under these circumstances so whatever

6   the Court wants to do at this point in time.

7          MR. FARRAH:  I -- what I'm hearing is that Mr.

8   D'Angelo knew when he was here in September, early September,

9   that there was going to be an award of attorneys' fees and that

12:27 10   any future violations of your orders were going to result in

11   severe sanctions; and that October 1st you ordered attorneys'

12   fees; that Mr. D'Angelo somehow felt that Mr. Amann was going

13   to take care of the attorneys' fees, for whatever reason, I

14   don't know.  It's not Mr. Amann who has held up everything

15   here; and that Mr. Amann was going to either pay it in three

16   installments to Mr. D'Angelo or get it paid in three

17   installments.  It's preposterous stuff, Judge.  And all of this

18   happens against the backdrop of D'Angelo settling a case, at

19   least one case, last month with a 190,000 --

12:27 20          THE COURT:  That's not the backdrop of this case.

21   That is not the issue here.  He hasn't said, I don't have the

22   money.  That isn't the dispute.  It is my trying to make this

23   case stay on its rails, people follow my orders.  I understand

24   there is a lot of anger between the parties, but I am not the

25   one in between here who's going to help put lemon in the wounds

1   back and forth.  With all due respect, this is a good time for

2   you to be quiet.  Just leave it there.

3       I am going to award a sanction of $3,000 to be paid by

4   defendant and/or their counsel.  I am going to refer you to a

5   magistrate judge to resolve that dispute of where that money is

6   coming from unless you tell me that the check has already been

7   paid and you don't need to have that services.  I don't want to

8   hear your disputes between you, but I also don't want this -- I

9   don't want the -- anybody outside of your dispute to be

12:29 10  affected by it, and I also don't want to be making any

11  assumptions about what that dispute is.  You've got

12  attorney-client issues, but why don't you put them out in front

13  of a magistrate and not in front of me.  So I am -- -

14          MR. D'ANGELO:  Judge, what's the amount?

15          THE COURT:  3,000.

16          MR. D'ANGELO:  I have until when to pay it?

17          THE COURT:  Fourteen days.

18          MR. D'ANGELO:  Thank you, your Honor.

19          MR. FARRAH:  Thank you, Judge.

12:29 20        MR. D'ANGELO:  Payable to him?

21          THE COURT:  Yes.

22          MR. D'ANGELO:  Or to the Court?

23          THE COURT:  To him.  He's had to bring -- he has had

24  to bring the time for the motion and sitting here, and I don't

25  get extra money for my library funds particularly.

1        Do you want a referral to the magistrate judge to

2    resolve who is paying that $3,000?

3        MR. D'ANGELO:  No, no need for that.  I'll take care

4    of it myself.

5        THE COURT:  Okay.  Anything further that we need to

6    deal with today?

7        MS. RIVERA-BUJOSA:  Just the 2017 tax returns of

8    D'Angelo Law Group and Stephen D'Angelo.  It's been requested.

9    It's just a matter of an update.  They must be available right

12:30 10    now.  I did send an email about it to counsel.

11        THE COURT:  Any reason we can't get the updated --

12        MR. D'ANGELO:  I just -- as I explained to you, I am

13    going to interview successor counsel here, and I should have an

14    answer this afternoon of who that might be.  So within a -- I'm

15    going to let them take responsibility for that within the next

16    week or so.

17        THE COURT:  Is there any dispute that there is a

18    request for tax returns that would be subject to a continuing

19    obligation to update?  Is that in dispute?

12:30 20        MR. D'ANGELO:  I don't know.  I haven't seen what the

21    interrogatory was or what was required.  If this Court tells me

22    I have to turn that over, then -- I plan on doing it anyway so

23    it doesn't really matter.  That was the intent.

24        MS. RIVERA-BUJOSA:  Okay.  Interrogatories and it's in

25    the -- it's also in the depositions subpoenas of D'Angelo Law

1    Group, the notice of depositions, notice of inquiry.

2         THE COURT:  Do you need those for the summary

3    judgment?

4         MS. RIVERA-BUJOSA:  Yes, because there were two major

5    cases that the checks came in in 2017 and were six figures.

6    That's why I want 2017.  It's Client Nos. 45 and 67, as I

7    mentioned in my email.  Those were deposited in 2017.

8    Obviously, we are aware of other ones that are happening.

9         THE COURT:  Let me ask you this question about your

12:31 10   summary judgment motion.  You're having two pieces to it.  One

11   is, I anticipate, you think you're entitled to money; and,

12   second, is the amount.

13        MS. RIVERA-BUJOSA:  Exactly.

14        THE COURT:  Those are two separate questions.  And

15   with regard to the amount, I'm not particularly interested in

16   putting, you know, personal tax returns on the docket and

17   things like that.

18        So is there a reason that it wouldn't make sense to

19   first address the legal issue of the obligation to pay rather

12:32 20   than the dollar amount or are these linked together?

21        MS. RIVERA-BUJOSA:  So I believe they are linked.  The

22   obligation to pay is -- there's the case when the law firm was

23   alive.  Up to the time of breakup, they had all the assets

24   available to satisfy the judgment at that time.  And I can show

25   there was willful disregard of a known full obligation, right?

1   So there's that part of the case.

2   Then there's the case of D'Angelo Law Group is holding

3   fees that, after breakup, still had not been paid into the

4   account.  And since Mr. Hashem is disbarred, there's that

5   question about could Mr. -- well, there's two questions.  One

6   is, is that the partnership is liable for this obligation, and

7   even though it had to -- it's -- see, it's complicated because

8   legally the firm exists.  D'Angelo and Hashem have not filed a

9   final return.  They filed annual reports.  But all it has right

12:33 10   now are IOLTA accounts, right?  Everything is under the hands

11   of the new firm.

12   So the part of the fees that have been generated

13   recently, that is what is going to highly likely -- that's part

14   of the contribution.  That happened -- that's two years, 2015

15   to -- just as recently as now, but the bulk, 2015, 2016, and

16   the theories of obligations there are a little -- well, there's

17   --

18   THE COURT:  My question is -- it seems to me that

19   we've got a lot to wrestle with on the legal theories.  My

12:34 20   question is:  Is there any reason -- what I'm really trying to

21   do is avoid a whole go-round about what can be on the public

22   docket and what should be filed under seal.  I don't like

23   having things under seal.  The First Circuit -- the First

24   Circuit says there's an presumption -- public presumption of

25   access to records that I need to make for my decisions, so

1     there's sort of a push to have things unsealed.

2              So what I've sort of come down to realizing is that,

3     if there are things I don't need to look at in order to inform

4     my decision, I can have things on the public docket and wrestle

5     with the legal concepts there.  So, for example, if there is no

6     dispute that there is a sum of money that was earned by one

7     entity on such and such case on one date and that amount -- and

8     that amount moved from here or here to here, what difference

9     does it make what that amount is for purposes of -- I

12:35 10   understand at the end it does because you have to finally

11    decide whether you, in fact, get the money.

12              But if I'm trying to figure out the legal concepts of

13    where the money moved, do I need to know what those -- what the

14    money amounts are?

15              MS. RIVERA-BUJOSA:  Understood.  You would need to

16    know when the monies came into possession.

17              THE COURT:  Yeah.  I need to know what it came in

18    with.  If it came in with a particular case, where it moved to,

19    et cetera.  But I don't know that I need to at this point have

12:35 20   the actual dollars.  But, I mean, maybe there's a reason

21    legally where you need that for your legal argument, but I

22    can't imagine what it is.

23              I guess what I'm suggesting -- again, since parties

24    haven't been able to work together, this may be extra hard.

25    But I am suggesting that it would be in everybody's interest to

1  avoid unnecessary disputes as we try to just get through the

2  legal issues, to simply address it as, you know, a Pot of Money

3  1, or whatever you want to call it, Pot of Money 2, Pot of

4  Money 3, rather than having to worry about what those dollar

5  amounts are.

6          MS. RIVERA-BUJOSA:  Understood, other than showing the

7  ability that the obligation could have been met at the --

8          THE COURT:  I understand that -- right, the part about

9  saying there was money in the law firm at certain time, I think

12:36 10  that I do need to know because you don't get outside of the law

11  firm unless you get to those pieces.  But the money that -- his

12  current income tax -- this is not to say you don't get those

13  forms, but I'm suggesting that I don't particularly want income

14  tax filings as part of your summary judgment motion if we can

15  avoid it, and if there's a -- if the facts are undisputed and

16  we can find a shorthand that makes clear what you need to

17  convey to me, that's good enough for the public record.

18          MS. RIVERA-BUJOSA:  That's fair enough.  One thing I'm

19  thinking about right now on the spot is that Mr. D'Angelo has

12:37 20  raised a defense in depositions that he was unable to pay, and

21  at these times it's either he went out of business or -- that's

22  his defense.  That's been made under oath.  I have proof

23  showing that at those times, IRS was paid, et cetera.  I know

24  the amounts that were owed and how much went through the law

25  firm's accounts.  Other than that, I need to show.  Okay.  And

1    then, obviously, after the law firm broke up, many cases

2    settled or monies came in very quickly.  So I think that's a

3    stronger those fees should come to the firm.  But he's

4    indicating that, well, since Mr. Hashem has no ability to earn

5    fees, he's claiming that he's the only one entitled to the fee

6    anyway.  And then, since he's not personally liable, this

7    judgment is not in his reach.  I, obviously, have to -- the

8    numbers that came in further show that the reasons of why the

9    preliminary injunction of 2012 was violated and that failure to

12:38 10    pay.  Even though it's in the name of another, it's still

11    monies that should be in D'Angelo and Hashem's name.

12          THE COURT:  Right.  I guess all I'm trying to say is

13    that to the -- I understand that you're going to need to

14    include dollars if there are arguments that there were -- that

15    there was an inability to pay, so I do follow that.  It just

16    seems to me that the bigger parts of this legal argument are

17    what is the obligation of one partner for the obligations of

18    the firm.  I mean, that seems to be the central question.  And

19    that central question, it seems to me, if we can get that teed

12:39 20    up, the rest of it falls in place one way or the other.

21          MS. RIVERA-BUJOSA:  Understood.

22          THE COURT:  Well, you -- if you need these documents

23    before filing your summary judgment motion, I'd like you to

24    coordinate.  If there's new counsel, you need to coordinate

25    with new counsel.  I, you know -- it doesn't help to have you

         1    snicker.

         2          MR. FARRAH:  I didn't mean to snicker, your Honor.  I

         3    apologize.

         4          MS. RIVERA-BUJOSA:  The last thing I want to ask is

         5    for more time.

         6          THE COURT:  I don't want more time either.  Let's do

         7    this:  This is -- we're talking about you filing in a week.

         8          MS. RIVERA-BUJOSA:  November 15th.

         9          THE COURT:  Two weeks.

12:40   10          MS. RIVERA-BUJOSA:  It's mostly deposition transcripts

        11    and there are exhibits.  I'm trying to focus on that.

        12    Obviously, some exhibits were tax returns, but I will -- I will

        13    take your counsel -- your judge's advice and consider that

        14    because there are other ways of showing that to get to the

        15    bottom of responsibility here.

        16          THE COURT:  Yeah.  The other way we can proceed with

        17    some of that is that, in the event that there is new counsel

        18    and they will agree with you that certain dollars are

        19    undisputed, then I don't need to see the documents.  If they

12:40   20    don't and don't have an opportunity to do that, then we're sort

        21    of stuck with this issue.

        22          All right.  Let's see where we are.  I would like

        23    weekly status reports from the defendant as to who is

        24    representing you.  So if you are getting new counsel -- right

        25    now, there needs to be somebody representing you; and if you

1    are firing your counsel, that's complicated for the law firm

2    because they need to be represented by counsel.  You can -- as

3    to yourself, you can be on the docket representing yourself.

4    If you have new counsel -- successor counsel, they can file it.

5    But I would like, on a weekly basis, to know who is there

6    responsible until this issue is resolved.

7           As of now, your current counsel is still counsel of

8    record.  And, Counsel, whatever ECF filings are done, you are

9    ordered to forward them the same day to your client.

12:41 10          MR. AMANN:  Understood.

11          THE COURT:  Anything else?  Okay.  On the summary

12   judgment motion, as with state court filings, you're going to

13   have a Rule 56.1 statement of undisputed material facts.  My

14   view of what that means is that the statements that are in the

15   statement of undisputed material facts are statements that you

16   think are material.  If you're just wanting to give me a whole

17   background story, you're welcome to put that in your brief if

18   you think you want to spend pages on that, but if they're not

19   material to this dispute, they're not part of that statement of

12:42 20   undisputed material facts.  The undisputed material facts do

21   not need to tell me the whole story.  They need to tell me the

22   facts that matter for the summary judgment motion.

23          MS. RIVERA-BUJOSA:  Uh-huh.

24          THE COURT:  Okay?

25          MS. RIVERA-BUJOSA:  Yes.

1            THE COURT:  For example, I don't need all of the back

2      history and all of the documentation of everything that

3      happened.  I need to start with:  There's a final judgment and

4      whatever you think happened next after that.

5            Once you've filed your statement of undisputed

6      material facts, email a Word version of the statement of

7      undisputed material facts to opposing counsel.  Opposing

8      counsel, when they file their response to the statement of

9      undisputed material facts, should use the same document as the

12:43 10    starting point.  That's why you're going to forward it in a

11     Word version, change the caption to theirs, and have a written

12     response to each one of those statements.

13           And once that is filed, forward a Word version of the

14     defendant's statement of response to the statement of

15     undisputed material facts.  When you file your reply, again,

16     you can -- if there's -- if they don't offer new facts, you

17     don't need to respond.  I don't need anything more.  But if

18     they've added additional facts that you want to respond to, it

19     comes in on the same one document so I don't have to be

12:44 20    handling back and forth.

21           MR. AMANN:  Sounds like a 9A.

22           THE COURT:  Exactly like a 9A except that, since we're

23     in federal court, we're actually filing them each step of the

24     way.  But the final document that I will, hopefully, be looking

25     at is the final combined one.

1          The other thing is that I find it very difficult to

2    follow people's citations to exhibits because you're calling it

3    Exhibit A to such and such, and I don't know what it is and

4    where to find it on the docket necessarily.  So as a courtesy,

5    if you would like to file -- two things.  One is, we request

6    courtesy copies of your voluminous filings so provide that.

7    But when you provide it, print it out with the header on top so

8    I can pull it -- I can see what ECF number you're dealing with.

9          And if you want to give me a cheat sheet on your

12:45 10    exhibits -- Exhibit A is 67-4; Exhibit B is 67-5 -- it's a

11    whole lot easier for me to follow as I'm going through it.

12    Otherwise, it's a lot of work to try to understand everybody's

13    individual citation system.

14          Thank you.

15          THE CLERK:  Court is in recess.  All rise.

16    (Whereupon, at 12:46 p.m. the hearing concluded.)

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3

4               I certify that the foregoing is a correct transcript

5       of the record of proceedings in the above-entitled matter to

6       the best of my skill and ability.

7

8

9

10

11

12       /s/Cheryl Dahlstrom

13       Cheryl Dahlstrom, RMR, CRR

14       Official Court Reporter

15

16       Dated:  November 8, 2018

17

18

19

20

21

22

23

24

25