UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SABA HASHEM, individually, and as a Member of, and derivatively on behalf of, D'Angelo and Hashem, LLC,     Plaintiff, <br><br> v. <br><br> STEPHEN L. D'ANGELO, D'ANGELO LAW GROUP, LLC, and D'ANGELO AND HASHEM, LLC     Defendants | Civil Action No. 16-cv-12383-IT |

## OPPOSITION TO EMERGENCY MOTION
## FOR PRELIMINARY INJUNCTION

NOW COME Intervention and Reach and Apply Defendants Stephen D'Angelo ("D'Angelo") and D'Angelo Law Group, LLC ('DLA") and opposes Intervention-Plaintiff's, ("Carrion") Emergency Motion for a Preliminary Injunction.

### Short Statement of Legal Argument

As grounds herefore, D'Angelo and DLA state that Carrion, through her counsel, has alleged, in shotgun fashion, at least 3 of the 4 theories of recovery under doctrine(s) of corporate "successor liability" without citation to any controlling legal authorities to support her position.[1] The lack of cited authority, discussed infra, is persuasive that there is no applicability of any of

---

[1] Carrion broadly asserts that D'Angelo and DLA are responsible to pay the execution she obtained against Hashem and D & H "under several theories of liability, 'including and without limitation,' successor liability or de facto merger doctrine, 'willful dissipation assets to 'fraudulently' avoid creditor's claims, and 'fraudulent transfer.'" *Carrion's Motion, p. 2.*

1

the 4 recognized theories under the doctrine of successor liability. The lack of authority to support Carrion's position does not create a scenario under the law that she has a "high likelihood of prevailing on the merits," as stated in her moving papers.

Additionally, there has been no willful "dissipation of 'assets.'" As discussed hereinbelow, free thinking law clients are not commodities or assets. Nor has there been any fraudulent transfer. Neither was any Court Order violated.[2] The Preliminary Injunction, issued on July 17, 2012 proscribed D & H and its partners, and others, from

> **"1) Taking any <u>unlawful</u> action to hinder or delay, or defraud, the plaintiff from collecting Plaintiff's judgment in [that] action; and 2) Transferring, alienating or encumbering any assets of the defendants other than in the ordinary course of business." (Emphasis and Bold added.)**[3]

Nowhere has Carrion showed the type of conduct prohibited by Justice Leibensberger's Order. It was impossible for D'Angelo to transfer, alienate or encumber any "assets." Clients, unlike widgets, aren't assets, and what D'Angelo did was in the only ordinary course of business he could undertake at the time of Hashem's suspension. In fact, D'Angelo was ethically tasked with communicating with every client, within a short period of time, to determine with whom and how they wanted to proceed with their claims.

Intervention-Plaintiff is also proceeding before this Court under a theory of "reach and apply." Regarding the remedy of reach and apply: reach and apply applies to those situations where monies owed to a judgment-creditor are being paid by a third party *to a judgment debtor*.

---

[2] Carrion's counsel incorrectly identifies the State Court Order for Preliminary Injunction as July 12, 2012. <u>Carrion's Motion, P. 2, Exhibit H, File Reference No. 54.</u>

[3] As a threshold statement, one thing that separates assets on the balance sheet from our customers is that our law clients have a preference, while our assets don't. Has your front end loader ever woken up one morning and said - I don't like this yellow paint; I am going to get my owner to paint me green? Simply put, we own assets, but I don't think that it truly can be said that lawyers own their clients.

(Emphasis added.) Neither D'Angelo nor DLA is a judgment debtor! G.L. 214, Section 3(7) which states in part, "…but unless it is a judgment debt, the business of the partnership shall not be enjoined or otherwise interrupted further than to restrain the withdrawal of any portion of the debtor's share or interest therein until the plaintiff's debt is established,…" Additionally Section 3(8) of G.L. 214 also requires fraudulent intent or a fraudulent transfer, conduct that has not occurred in this matter, which is discussed below in more detail. Section 8 requires "*Actions to reach and apply in payment of a debt any property, right, title or interest, real or personal, of a debtor, liable to be attached or taken on execution in a civil action against him and fraudulently conveyed by him with intent to defeat, delay or defraud his creditors, or purchased, or directly or indirectly paid for, by him, the record or other title to which is retained in the vendor or is conveyed to a third person with intent to defeat, delay or defraud the creditors of the debtor.*" That type of conduct has simply not occurred in the case before Your Honor.

Secondly and equally important, the law does not provide that someone who has a remedy of damages, which Carrion has already obtained, (regardless of whether it has been collected,) that "irreparable" injury has occurred or will occur. *See generally Packaging Industries, Inc. v. Cheney*, 380 Mass. 609. It is well settled law that <u>both prongs</u> have to be proven for a Court to order the extraordinary relief of an injunction, particularly an injunction whose terms orders a person to affirmatively do something, i.e. deposit funds. (Emphasis added.) *See generally Mass. R. Civ. P. 65*.

From a public policy standpoint, if the Court were to issue and Order which Carrion seeks, the traditional notions of the limited liability entities and respect for the corporate entity recognized in the Commonwealth, without the existence of one of the 4 exceptions, would be abrogated. On the other hand, Carrion has a judgment for damages. *That is her remedy under*

*the law.* No amount of impatience by her or her counsel in *collecting* monies to satisfy that judgment can be transformed into a situation where she faces a truly irreparable injury within the meaning of the law. (Emphasis added.) The Massachusetts Supreme Judicial Court has defined, narrowly, the meaning of irreparable harm. Irreparable harm is not any kind of harm a party can invoke, but "a ***loss of rights*** that cannot be vindicated should it prevail after a full hearing on the merits." (Emphasis and Bold added.) *Packaging Industries, Inc. v. Cheney*, 380 Mass. 609, 616 (1980). This is not the situation in the case before your Honor.

From a balance of the harms perspective, an order escrowing 100% of settlements would simply and swiftly derail the operations of DLA, the entity from which Intervention-Plaintiff is seeking recovery. The relief that Intervention-Plaintiff seeks would not simply create an inconvenience. As discussed below, DLA has clients, trade creditors, rent, taxes and staff and professional employees who depend on the ability of DLA to operate in the ordinary course of business. Those employees have personal financial obligations of their own such as rent, mortgages, car payments and grocery needs.

## Analysis

I. **The Theory of "De Facto Merger" and Doctrine of Successor Liability does not and should not apply.**

The traditional exception for de facto mergers, as Carrion's counsel asserts, is a narrow one. As a threshold matter, the theory of de facto merger contemplates that a transaction took place between 2 entities: a sale of assets for instance. *Cargill, Inc. v. Beaver Coal & Co.*, 424 Mass. 356 (1997). Just as importantly, four factors are relevant regarding whether a transaction amounts to a de facto merger. They are, *in the conjunctive*:

1) Whether there is continuity of management, personnel, physical location assets, and general business operations; and

2) Whether there is a continuity of shareholders because the purchasing corporation paid for the assets of the seller with shares of the buyer's stock; and

3) Whether the selling corporation ceases to do business; and

4) Whether the purchasing corporation assumes the obligations necessary to continue the normal business operations of the seller. *Id. at 360.*

In the case at bench:

1) The management is different. D & H was a 2 person member-managed limited liability company ("LLC") and DLA is a 1 person member-managed LLC.

2) There is no continuity of shareholders or membership interests, and

3) There was no purchase of seller's assets with buyer's stock, either.

4) As pointed out there was never any sale, but D & H ceased operations; and, DLA never expressly or implicitly knowingly assumed the obligations of D & H.

**II.   There is also no evidence of fraudulent intent or fraudulent transfer.**

Intervention-Plaintiff Carrion claims that D'Angelo's meetings with former individual clients of D & H and, formation of DLA after the Hashem suspension, and allowing D & H to become administratively dissolved was his "deceitful effort" to deprive Carrion of her then ability to collect monies to satisfy her judgment and

that these activities were "illegitimate efforts" constituting "fraudulent transfers". *Carrion's Motion, P. 3.*

Any Court would be hard-pressed to establish that the "transaction", or rather the emergency situation that was forced upon D'Angelo, and the resulting ethical obligations he was obliged to undertake, which he complied with, was or were intended to defraud the creditors of the predecessor LLC or its creditors. Argument to the contrary is mere hyperbole and a jump from, understandably, frustration with collections to a conclusion of nefarious motive.

Typically, the transaction, as was D'Angelo's cessation of his business ties with Hashem and D & H, and his subsequent individually meeting and/or corresponding with each D & H client as to whether they wished to seek other counsel, was legitimate. *Melick, Jeffrey C. and Kayko, Weisman & Colsanti, LLP, Massachusetts Tort Law Manual, Section 2.6.6 [Successor Corporation Liability].*

D'Angelo also was prohibited from sharing fees with an incapacitated lawyer, Hashem, after he was suspended. *See Massachusetts Rule of Professional Conduct 5.4(a).* Hence, the lack of sharing or "escrowing" D & H revenues at that time was prohibited ethical canon.

### III. Clients of professionals are not assets

The nature of professional clients' value is found in personal goodwill, not enterprise goodwill: *Gaines v. Luongo, No. A-3600-09T3 Superior Court of New Jersey, Appellate Division March 25, 2011*

A discussion of enterprise and personal goodwill is helpful to an analysis of whether former D & H clients can be viewed as assets. Value assigned to a client would only be paid with the expectation that the elements of value associated to the client could be transferred to another owner, as opposed to value that resides solely with the current owner. Enterprise goodwill is the goodwill of the business. In selling a business one has the ability to transfer enterprise goodwill to the buyer. Personal goodwill is goodwill that adheres to an individual. It consists of personal attributes of a practitioner including personal relationships, skill, personal reputation and various other factors. It is usually not transferrable. A useful working definition of personal goodwill is "the part of increased earning capacity that results from the reputation, knowledge and skills of an individual person and is not transferrable and unmarketable.

The value of clients in a professional corporation is found in the personal goodwill of the particular professional. D'Angelo submits that it was he who created as well as preserved the personal goodwill of the clients. Along these lines, it seems logical to allow Hashem, the culpable actor underlying all of this, to go forward with his "quantum meruit" claims and that there be no recovery until those claims are adjudicated at this procedural posture in the case.

Gaines and Luongo recognized this when they dissolved their accounting firm, GGL, and left it up to the clients to determine who they wanted to utilize as their accountant. This New Jersey Appellate Court found that in a dissolution of a professional firm clients were not assets. In fact, in this New Jersey matter, which is

instructive in this matter, Accountants Gaines and Luongo left it up to the clients to decide who they wanted to utilize for their professional services. As the Court knows, attorneys are ethically bound to all allow clients this discretion. Accordingly, D'Angelo, when left with a fellow LLC member's suspension from the practice of law, acted as he must under the Massachusetts Rules of Professional Conduct.

**IV.** **Intervention-Plaintiff cannot show a genuine "irreparable injury"**

In order to make a suitable showing of irreparable injury, the moving party must establish a colorable threat of immediate injury, *see Massachusetts Coalition of Citizens With Disabilities v. Civil Defense Agency,* 649 F.2d 71, 74 (1st Cir. 1981), and the absence of any adequate remedy at law for such injury. *McDonough v. United States Department of Labor,* 646 F. Supp. 478, 482 (D. Me. 1986).

Finally, where economic damages are the injury relied upon, it is to be remembered that economic harm, in and of itself, is not sufficient to constitute irreparable injury. *Id. See also McDonough v. Trustees of University System of New Hampshire,* 704 F.2d 780, 784 n.2 (1st Cir. 1983).

Intervention-Plaintiff's harm is economic, not and immediate harm that could never be redressed absent Court interdiction. It can be remedied with a legal judgment. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop, 839 F. Supp. 68.*

### V. A weighing of the balance of harms do not comport with the scope of relief.

Public policy supports the traditional recognition of the corporate form and limited liability of same absent a showing of all 4 elements of the successor liability doctrine. Imposition of liability by Court Order, especially prior to any judgment, along the parameters of what Intervention-Plaintiff seeks ignores the general recognition of corporations and limited liability companies' limited liability in the Commonwealth.

It is also respectfully submitted that the Court should also consider the interference with D'Angelo's ability to continuing operating DLA. Expected settlement revenues are often already "called for." Specifically D'Angelo incurs substantial expenses, including payroll, (Attorneys are paid upon settlement collection), often for many weeks of work. Other expenses include expert witness fees, costs related to suits and operation of the firm, and quarterly taxes. It is simply impractical and unfair to the employees of the law firm to have the cash flow of the firm so drastically interfered with.[4] Should the Court be inclined to issue a preliminary injunction, it is respectfully requested and suggested that a certain percentage of the cash flow be exempt from your Honor's order, so as to allow DLA to continue to operate, serve its clients, pay its necessary bills, payroll and taxes and earn revenues.

---

[4] A review of the accounting provided to this Court, as Ordered shows the demands on DLA's cashflow, in other words its revenues from settlements…

On the other hand, it is respectfully submitted that Intervention-Plaintiff's assertions about Defendants' ability to have entire settlements escrowed to pay her judgment assumes and conjects much about the cash flow of DLA, and the demands on that cash flow from DLA's contingency fee based legal practice. (See also the Affidavit of Stephen D'Angelo submitted herewith.)

**Conclusion**

It is respectfully posited that a preliminary injunction should not and cannot issue. Intervention-Plaintiff has failed to show a high likelihood, as she claims in her moving papers, or likelihood that a de facto merger took place in this matter. Moreover, there was no fraudulent transfer of assets, or surreptitious activity of any nature to defraud creditors by D'Angelo and DLA. Public policy supports the traditional recognition of the corporate form and limited liability of same absent a showing of all 4 elements of the successor liability doctrine. A weighing of the balance of the harms, should this Honorable Court order an Injunction with the scope and parameters of what Intervention-Plaintiff seeks would tip the scales on inequity of those clients, creditor and employees and their families who depend on the capability of DLA to continue to operate.

Dated: December 4, 2018

Respectfully submitted,

Defendants,
Stephen D'Angelo and
D'Angelo Law Group, LLC
by their attorneys,
*COSSINGHAM LAW OFFICE, PC*

_____/s/_____
Kenneth A Cossingham Esquire
BBO#100970
Thomas C. LaPorte, Esquire
BBO#634194
Cossingham Law Office, PC
30 Massachusetts Ave., Suite 404
North Andover, MA  01845
Tel: 978-685-5686
Fax: 978-794-0985
kcossingham@cossinghamlaw.com

CERTIFICATE OF SERVICE

I, Kenneth A. Cossingham, Esquire hereby certify that on this 4th day of December 2018, a copy of the foregoing Opposition to Emergency Motion for Preliminary Injunction was served via the Court's CM/ECF system to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

_____/s/_____
Kenneth A. Cossingham, Esquire